**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK S. MOON,** | : | |
| Plaintiff | : | **CIVIL ACTION NO. 3:04-1356** |
| v. | : | **(CAPUTO, D.J.)** |
| | | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** **Commissioner of Social Security,** | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act"). 42 U.S.C. §§ 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

**I. Procedural Background**

The plaintiff protectively filed his application for SSI benefits on April 19, 2001, in which he alleged disability since July 13, 2000, due to a severe laceration of his left hand, and resulting chronic pain syndrome. (TR. 15).

After his claim was denied (TR. 61-65), the plaintiff's application was heard by an administrative law judge ("ALJ"), on August 7, 2003. The plaintiff was represented at his hearing before the ALJ by different counsel than who represents him in this appeal. In addition to the plaintiff's testimony, the ALJ heard testimony from Dr. Joseph Bentivegna, a vocational expert. (TR. 27-60).

On November 24, 2003, the ALJ issued a decision in which he found that: the plaintiff had not engaged in substantial gainful activity since July 13, 2000; the medical evidence established the plaintiff had residuals due to the traumatic laceration injury to his left hand, but that these impairments did not meet or equal any listed impairment found in the regulations at Appendix 1, Subpart P, Regulations No. 4; the plaintiff's statements concerning his impairments and their impact on his ability to work were not consistent with the medical evidence or his self-reported activities of daily living; the plaintiff had the residual functional capacity to perform light work with no limitations in sitting, standing or walking; the plaintiff's ability to perform the full range of light work activity was limited by his inability to use more than the right, dominant hand and his need to avoid exposure to ladders, ropes, scaffolds, unprotected heights and dangerous or moving machinery. The ALJ further found that the plaintiff was unable to perform his past work as a cook, a deck addition improvement worker and a handyman. (20 C.F.R. 416.968).

The ALJ further concluded that the evidence established that the plaintiff retained the functional ability to perform certain sedentary work, such as work as an inventory clerk, a health care aide, a food manager, and a receiving clerk, and that these jobs existed in significant numbers in the local, state and national economies.  As a result, the ALJ found that the plaintiff had not been under a disability, as defined in the Social Security Act, at any time relevant. (20 C.F.R. 416.920(f)). (TR. 15-21).

The plaintiff filed a request for review of the ALJ's decision with the Appeals Council which was denied on April 19, 2004, thus making the ALJ's decision the final decision of the Commissioner. (TR. 5-10).  Currently pending before the Court is the plaintiff's appeal of the decision of the Commissioner of Social Security which was filed on June 23, 2004. (Doc. No. 1).

**II. Disability Determination Process**

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the

applicant from doing any other work. (20 C.F.R. § 416.920).

The instant action was ultimately decided at the fifth step of the process when the ALJ determined that the although the plaintiff did not have the residual functional capacity to return to his past relevant work, he was capable of performing certain light and sedentary level jobs, and that there were a significant number of such jobs in the local, regional and nationally economy that he could perform.  (TR. 21).

**III.  Evidence of Record**

The plaintiff was born on September 8, 1961, and was thirty-eight  (38) years old at the time of the ALJ's decision.  (TR. 20, 33, 98).  His past work experience includes employment as a unskilled cook, semi-skilled deck addition improvement worker and handyman.  (TR. 19, 103).  The plaintiff has a high school equivalency diploma. (TR. 20, 33, 108).

The medical evidence of record is not complex.  It establishes that on July 13, 2000, the plaintiff sustained severe laceration injuries to his left hand when it came into contact with a circular saw.  The plaintiff stated that he was privately employed as a handyman at the time the injury occurred. (TR. 102). The plaintiff underwent immediate trauma surgery at Cooper Health System Hospital in Camden, New Jersey, which was performed by Dr. John Catalano. (TR. 104).  The plaintiff eventually underwent additional surgeries, for bone grafts and a tendon release surgery.  A rehabilitation consultation performed

4

at The Cooper Health System on July 14, 2000, stated that the plaintiff's prognosis for rehabilitation was "good." (TR. 204). The plaintiff also underwent physical therapy. He was eventually referred to Alex Cueto, M.D., a pain management specialist, who diagnosed chronic pain syndrome. (TR. 319).

The plaintiff stated at the hearing held on August 7, 2003, that at some point he realized that he had become chemically dependent upon Oxycontin, and that he had spent seven days in treatment for this drug dependency. (TR. 40). The plaintiff also candidly admitted that he had frequently engaged in narcotic-seeking behavior by going to hospital emergency rooms and telling the staff that he had possibly reinjured his left hand, causing him extreme pain. The record bears this out, as follows.

On October 17, 2000, the plaintiff reported to the ER of The Cooper Health System complaining of left hand pain and was given narcotic medications. (TR. 262). On October 26, 2000, the plaintiff reported to Our Lady of Lourdes Hospital complaining of left hand pain and was given narcotic pain medication. (TR. 270). On November 28, 2000, the plaintiff reported to The Cooper Health Care System complaining of left hand pain and was given narcotic medication. It was also at this time that it was determined that he should undergo rehabilitative surgery. (TR. 278-281). On February 2, 2001, the plaintiff reported to The Cooper Health Care System complaining of left hand pain and was again given narcotic medication. (TR. 305). In May 2001,

the plaintiff started treating with Howard Zeidman, M.D. for follow-up treatment, Dr. Zeidman who prescribed Percocet. (TR. 399). On December 27, 2001, the plaintiff reported to the West Jersey Health System and stated that he had fallen on his left hand, reinjuring it, and was prescribed narcotic medication. (TR. 339). On December 31, 2001, the plaintiff underwent an orthopedic evaluation performed by Ronald L. Gerson, M.D., who recommended debridement surgery. The surgery was conducted on January 10, 2002, at Kessler Memorial Hospital in Hammonton, New Jersey. (TR. 355-356). On February 7, 2002, the plaintiff reported to the Kessler ER complaining of left hand pain, for which he received narcotic medication. (TR. 359).

On August 12, 2002, the plaintiff reported to the ER of Blair Memorial Hospital and stated that he had re-injured his left hand. He was given a prescription for Percocet. (TR. 410). On August 20, 2002, the plaintiff reported to the ER at Fulton County Medical Center complaining of reinjury of his left hand. He was given a prescription for Vicodin. (TR. 413). On September 22, 2002, the plaintiff reported to the ER at Lewistown Hospital and stated that he had reinjured his left hand. He was given a prescription for Percocet. (TR. 420-422). On September 24, 2002, the plaintiff reported to the ER at Tyrone Hospital and stated that he had reinjured his left hand. He was given a prescription for Oxycodone. (TR. 428-429). On March 18, 2003, the plaintiff reported to the ER at The Hershey Medical Center and stated that he

had reinjured his left hand.  He was given a prescription for Percocet. (TR. 433).  On March 24, 2003, the plaintiff again reported to the ER at Lewistown Hospital, and stated that he had reinjured his left hand.  He was given Percocet in the ER, and a prescription for Darvocet. (TR. 442).  On April 23, 2003, the plaintiff reported to the ER at Blair Memorial Hospital, and stated that he had reinjured his left hand.  He was given a prescription for Ultram. (TR. 448).  On May 12, 2003, the plaintiff reported again to the ER at Tyrone Hospital, and stated that he had reinjured his left hand.  He was given a prescription for Vicodin. (TR. 452).  On July 25, 2003, less than two weeks before the hearing held in this matter, the plaintiff reported to the ER at Chambersburg Hospital and stated that he reinjured his left hand while fishing.  He was given Vicodin and Percocet. (TR. 456).  It is important to note that on each and every visit to the various emergency rooms, the plaintiff had new x-rays taken.  Without exception, each reported findings was consistent, only, with the original injury of July 13, 2000.

On January 15, 2003, Dr. Zeidman's office notes indicate that a pharmacy had called his office to inform him that the pharmacy would not fill a recent prescription for Percocet written for the plaintiff by Dr. Zeidman, because the plaintiff had just recently had a prescription filled for the same drug on January 11, 2003, written by another physician. (TR. 403).

On June 19, 2003, Dr. Zeidman discharged the plaintiff and told him that he needed to find a family physician. (TR. 393). Dr. Feidman's notes indicate

7

that the plaintiff was told on July 17, 2003, that no more prescriptions for Percocet would be written for him. (TR. 400).

An Agency non-treating, non-examining physician completed a Residual Functional Capacity Assessment form on July 26, 2001, after reviewing the record. That reviewer concluded that the plaintiff was capable of lifting up to 10 pounds frequently, and up to 20 pounds occasionally. The reviewer noted that the plaintiff was right hand dominant, and that he would be limited to jobs not requiring use of the left hand. The reviewer concluded that the plaintiff was capable of sedentary work. The reviewer also noted that the plaintiff appeared to be credible regarding his complaints of pain. (TR. 330-335).

There was also a mental status examination performed on July 24, 2002, by Morris M. Rubin, Ed. D. Upon examination, Dr. Rubin concluded that plaintiff's disability was due to the loss of use of his left hand and arm, which was expected to last indefinitely. It was noted that his limitations are caused by pain and resultant anxiety and depression. (TR. 366-370). Furthermore, the diagnoses were: Axis I, Post Traumatic Stress Disorder; Axis 2, Dysthymic Disorder;  Axis 3, severed left hand, throbbing pain; Axis 4, Economic problem; Axis 5, "40."  The reviewer's conclusion was that, if awarded benefits, the plaintiff was competent to manage his own finances. (TR. 366-370).

An Agency non-treating, non-examining source prepared a Psychiatric Review Technique form on July 29, 2002, which indicated that the plaintiff

demonstrated only mild restrictions of daily living; in maintaining social functioning; in maintaining concentration, persistence or pace, and that there were no repeated episodes of decompensation of extended duration. The reviewer stated that the mental status exam revealed "no significant abnormalities." (TR. 379-391).

The plaintiff testified at the hearing held on August 7, 2003. He testified that his major problem which prevented him from working was constant severe pain in his left hand. As indicated above, he candidly admitted that he often went to hospital emergency rooms to obtain narcotic prescriptions, because, he said, no other pain medication helped him. (TR. 40). He said:

> I merely tell them something like I fell, or I banged my hand real hard and then I am in a lot of pain because I am in a lot of pain. But I tell them—see, you just can't walk in and say my hand hurts, they'll give you aspirin and send you home, you know. So I tell them I fell or I hurt my hand. And they x-ray it. And they, they give me a prescription from (INAUDIBLE), fifteen percocets.

(TR. 41).

Finally, Dr. Joseph Bentivega, a vocational expert also testified at the hearing. Based on the ALJ's hypotheticals, Dr. Bentivega concluded that, despite his left-hand impairment, and need for pain medication, the plaintiff was capable of light duty employment, which included work as a house care aid; a traffic director, and as a receiving clerk. (TR. 55-56).

## IV. <u>Discussion</u>

The plaintiff argues that the Commissioner committed several errors at the administrative level. Specifically, the plaintiff avers that the ALJ: (1) erred in failing to find that Mr. Moon's post-traumatic stress disorder and dysthymic disorder were not severe impairments; (2) erred in failing to properly address the credibility of the plaintiff's testimony regarding his usual daily activities, and his level of pain, and (3) erred in discounting the vocational evidence regarding the plaintiff's ability to perform work on a sustained basis. (Doc. No. 13, p. 12-15). He maintains that the decision of the ALJ is not supported by substantial evidence, and that a more balanced review of the record must compel the conclusion that he was disabled from any kind of gainful activity as of July 13, 2000, the alleged onset date of disability. He requests that this court reverse the ALJ's decision and substitute an award of benefits. (Doc. No. 17).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite his impairments, the plaintiff retained the residual functional capacity to perform a range of available sedentary to light level jobs, thus dictating a finding of "not disabled" as defined by the Act. (Doc. No. 12).

After carefully reviewing the record, it appears that the ALJ's findings are supported by substantial evidence in the record. Thus, the decision should not be disturbed on appeal.

Although the plaintiff sets forth three separate claims on appeal, it is evident that his primary assertion is that the ALJ's decision is not supported by substantial evidence.  He believes that the medical evidence does not establish that he retains the functional capacity to perform certain limited work, not using his left hand.  The plaintiff complains:

> In evaluating the medical evidence of record, the ALJ erred in discounting and/or minimizing all of the medical evidence of record, and in impermissibly substituting his own opinion for those of the physicians of record, in an effort to support his conclusion that Mr. Moon is disabled.  The ALJ consistently ignored substantial medical evidence that supported a finding of disabled.

(Doc. No. 13, p. 10).

The ALJ stated in his opinion in this regard that:

> ...[T]he undersigned notes the claimant cooked, vacuumed and swept with the right dominant hand, went to the library, attended social gatherings despite his complaint he had to leave because of the pain. He was able to hold a plate with his left thumb and finger, as well as a cup...
>
> ...[T]he medical evidence reflects his numerous activities including climbing ladders, playing hide-and-go-seek, fishing, playing with children, diving into a lake, running, riding in a car and helping family...Additionally the records indicated grip strength was 5/5 in the right, dominant hand, he had increased range of motion in the second, third and fourth fingers and therapy provided progress ...
>
> ...The vocational expert testified an individual who missed three days of work in a week or nine days in a row would preclude all full time employment.  However, the undersigned concludes the credible evidence fails to support such limitations...

(TR. 15-21)(internal citations to record omitted).

There is no indication that the ALJ ignored any medical evidence in the file, or that he substituted his own medical analysis of the plaintiff's limitations, as suggested by the plaintiff. The plaintiff maintains that Dr. Cueto opined that the plaintiff's injury prevented him from performing any work activities, and refers the court to Dr. Cueto's report dated June 21, 2001. (TR. 311). That report, however, is a "check-the-box" form which was required for medical assistance from the State of New Jersey. Although Dr. Cueto did check the box indicating "No Work" he also checked the category indicating that the plaintiff had the "functional capacity adequate to perform only little or none of the duties of usual occupation or of self care." He also indicated that the period of disability in question was July 2001 through December 2001. He did not render an opinion that the plaintiff was incapable of any and all work. Furthermore, a physician's physical capacity form, standing alone, is not substantial evidence. Green v. Schweiker. 749 F.2d 1066, 1071, n.3 (3rd Cir. 1984); *See also* Mason v. Shalala, 944 F.2d at 1065 ("Form reports in which a physician's obligation to check a box or fill in a blank are weak evidence at best..."). Also, the period of disability suggested, that is, from July 2001 through December 2001, does not meet the Act's statutory definition of disability. The plaintiff bears the burden to show that his impairments prevented him from doing all work for a period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Petition of Sullivan, 904 F.2d at 845.

The plaintiff also complains that the ALJ erred in failing to find that the plaintiff's diagnoses of post-traumatic stress disorder, and dysthymic order, were not severe impairments. There is, however, no evidence in the record which suggests that these conditions were severe, or contributed in any significant manner to the plaintiff's alleged inability to do even sedentary work on a sustained basis. In fact, the psychological report of Dr. Rubin relied upon by the plaintiff states that the plaintiff could lift up to 20 pounds with his right hand, and that he had no restrictions in walking, standing, sitting, climbing stairs or reaching high. The only limitation noted was the limitation of lifting or grasping with his left hand. It was noted that the plaintiff's "disability" was due to his lack of use of his left hand and arm, and that he had resultant pain and anxiety. Dr. Rubin did not render an opinion that the plaintiff was completely disabled from any and all work. (TR. 366-370). Furthermore, as noted above, an agency source prepared a Psychiatric Review Technique form on July 29, 2002, which indicated that the plaintiff demonstrated only mild restrictions of daily living; in maintaining social functioning; in maintaining concentration, persistence or pace, and that there were no repeated episodes of decompensation of extended duration. The reviewer stated that the mental status exam revealed "no significant abnormalities." (TR. 379-391).

The plaintiff also claims that the ALJ erred in discounting the vocational evidence regarding the plaintiff's ability to perform work on a sustained basis, and erred in failing to properly address the credibility of the plaintiff's

testimony regarding his usual daily activities, and his level of pain.  The ALJ did not discount the vocational evidence, nor did he fail to properly address the plaintiff's credibility.  As indicated above, the ALJ stated that the credible evidence failed to support the plaintiff's claims of severe, constant pain and/or physical limitations, other than those associated with his left hand.  Credibility determinations as to a claimant's testimony regarding his limitations are for the Administrative Law Judge to make.  <u>VanHorn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir. 1983).  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the Administrative Law Judge's observations concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984).

When reviewing the Commissioner's denial of disability benefits, this court is limited to determining whether the Commissioner's denial is supported by substantial evidence. <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  It is less than a preponderance of the evidence but more than a mere scintilla. Our review of the record reveals that there is substantial evidence to support the findings and conclusions of the ALJ.  As a result, the decision should not be disturbed on appeal.

**V. Recommendation.**

On the basis of the foregoing, **IT IS RECOMMENDED THAT** the plaintiff's appeal be **DENIED**.

s/ Malachy E. Mannion<br>
MALACHY E. MANNION<br>
United States Magistrate Judge

Date: July 1, 2005

O:\shared\REPORTS\2004 Reports\04-1356.1.wpd